# EXHIBIT B (part 1)

STRATEGIC MARKETING AGREEMENT

This STRATEGIC MARKETING AGREEMENT is made as of August 18, 2006 (the "Agreement"), by and between THE GRACIE MOVIE LLC ("GM" or "Producer"), and THE GATORADE COMPANY ("Gatorade"), the manufacturer of Gatorade Thirst Quencher and other products.

WHEREAS, GM is writing, producing, editing and securing distribution for a major motion picture titled "Gracie" (the "Film") for a scheduled domestic theatrical release beginning in June 2007 as set forth below and seeks a Global Title Sponsor; and

WHEREAS, Gatorade is a global sports beverage company that seeks to create product awareness for its related consumer brands through affiliation with the Film;

NOW, THEREFORE, the two parties hereby agree as follows:

1. **Gatorade Sponsorship Rights and Benefits**

    1.1    Marketing Rights

Gatorade shall be Global Title Sponsor for the Film. As such, Gatorade will have the exclusive marketing rights specified in Section 1.2 and the other rights specified elsewhere in this Agreement, including, without limitation, (i) the rights set forth in Section 1.3 to approve any sponsorship, marketing or other promotional arrangement (each an "Other Sponsor Agreement") between the Producer and/or the Distributor (as defined below) and any other promotional sponsor, marketing partner or other promotional party for the Film in North America, other than the Distributor (each such promotional party, an "Other Sponsor") and (ii) the rights set forth in Section 3 to approve any distribution agreements (each, a "Distribution Agreement") between the Producer and each distributor of any rights in the Film in North America (which distributor(s) shall be designated by the Producer and approved by Gatorade, with such approval to be exercised in accordance with Section 3) (collectively, the "Distributor"). As used herein, "North America" shall be defined as United States, Canada and their respective territories, commonwealths and possessions.

    1.2    Exclusivity

        1.2.1    Gatorade shall have exclusivity in North America for all Marketing Rights (as defined below) with respect to the Film for the entire Food and Beverage product category during the period (the "Term") from the date hereof to the earlier of (i) the date which is six (6) months following the Actual DVD Release Date (as defined below) and (ii) any earlier termination of this Agreement by GM pursuant to Section 12. The Food and Beverage product category shall include all food or beverage products (including, for purposes of clarity, water, but excluding coffee) and all fast food restaurants and quick serve restaurants (excluding Starbucks). GM will not exercise, conduct, or exploit, nor will GM authorize any third party to exercise, conduct or exploit, any of the Marketing Rights in the Food and Beverage product category during the Term.

1.2.2 In addition, during the Term (subject to Section 1.2.5(c) below) Gatorade shall have exclusivity for all promotional and marketing campaigns, programs or other Marketing Rights which are conducted or exercised within any grocery stores, mass merchandise retailers, wholesale clubs, convenience stores, and/or any other sales channels in North America in which Gatorade products are sold on the date hereof and which are more specifically identified in Exhibit F hereto (the "Gatorade Sales Channels"), regardless of whether or not such campaigns, programs, or Marketing Rights are in the Food and Beverage product category. GM will not exercise, conduct or exploit, nor will GM authorize any third party (other than as set forth in Section 1.2.5(c)) to exercise, conduct or exploit, any promotional or marketing campaigns, programs or other Marketing Rights which are conducted or exercised within the Gatorade Sales Channels during the Term.

1.2.3 In addition, GM will not engage, contract with or otherwise authorize (i) throughout the world in perpetuity, The Coca Cola Company or any of its affiliates or (ii) throughout North America during the Term, any other person or other entity that manufactures any other branded beverage product (other than coffee) to become involved in any manner whatsoever with the Film, any exploitation of ancillary rights in the Film, or the advertising, marketing and promotion thereof (other than customary catering arrangements in connection with the production of the Film and promotional events in connection with the distribution thereof; provided, however, that in no event will products produced or distributed by The Coca Cola Company or any of its affiliates be available in connection with the production of the Film or promotional events in connection with the distribution thereof).

1.2.4 As used herein, "Marketing Rights" shall include, without limitation, any sponsorship, affiliation, product placement/integration, tie-in, tie-up, marketing, promotional, merchandising, event marketing, sampling, and other similar rights whatsoever in connection with the Film, any ancillary rights in the Film, and the advertising, marketing and promotion thereof, but in any case, shall exclude any such rights in connection with any prequel or sequel to the Film or television spin-off (each, a "New Work") based on the Film unless otherwise agreed in writing by the parties; provided, however, that Gatorade shall have a right of first negotiation/matching last refusal to be the exclusive Food and Beverage sponsor, and obtain Marketing Rights for such product category with exclusivity in its then Gatorade Sales Channels, in connection with each New Work in accordance with the following terms. In the event that GM or any of its affiliates decides to produce, or authorizes the production of, any New Work, GM shall notify Gatorade, and Gatorade and GM (or GM's affiliate or licensee, as the case may be) shall negotiate in good faith for a period of not more than sixty (60) days with respect to mutually agreeable terms and conditions upon which Gatorade will become the exclusive Food and Beverage sponsor of, and obtain Marketing Rights for such product category with exclusivity in its then Gatorade Sales Channels, in connection with such New Work. If Gatorade and GM (or GM's affiliate or licensee, as the case may be) are unable to agree upon mutually agreeable terms, then GM (or GM's affiliate or licensee, as the case may be) shall have the right to offer to third parties (other than The Coca Cola Company) the right to become a Food and Beverage sponsor of, and obtain Marketing Rights in connection with, such New Work; provided, however, that

prior to entering into any agreement with any such third party, GM (or GM's affiliate or licensee, as the case may be) shall first submit to Gatorade the terms and conditions which GM (or GM's affiliate or licensee, as the case may be) is then prepared to accept from such third party, and Gatorade shall thereupon have a right, within ten (10) business days after receipt of such terms and conditions, to notify GM (or GM's affiliate or licensee, as the case may be) that Gatorade elects to enter into an agreement with GM (or GM's affiliate or licensee, as the case may be) on all of such terms and conditions, in which event GM (or GM's affiliate or licensee, as the case may be) shall enter into an agreement with Gatorade on such terms and conditions. If Gatorade does not within such ten (10) business days period notify GM (or GM's affiliate or licensee, as the case may be) that it wishes to enter into such an agreement on such terms and conditions (with silence being deemed a rejection), then GM (or GM's affiliate or licensee, as the case may be) shall be free to enter into an agreement with such third party on such terms and conditions. If GM (or GM's affiliate or licensee, as the case may be) does not accept such third party offer, the provisions of this Section shall continue to apply to any other third party offers.

       1.2.5    GM shall have the following obligations with respect to Distributors, Other Sponsors (as defined in Section 1.3 below) and foreign sales agents:

       (a)    GM shall advise each Distributor, Other Sponsor and foreign sales agent of the exclusivity obligations set forth in this Agreement.

       (b)    Each agreement between GM and each Distributor of any rights in the Film in North America shall expressly reserve to GM all Marketing Rights in the Food and Beverage product category.

       (c)    Notwithstanding anything to the contrary contained in Sections 1.2.1 or 1.2.2 above, each Distributor of any rights in the Film in the U.S. shall have the right (i) to conduct and/or exercise promotional and marketing campaigns, programs or other Marketing Rights within any of the Gatorade Sales Channels after August 15, 2007, so long as such campaigns, programs or Marketing Rights are not in the beverage product category and (ii) to exercise, conduct and exploit Marketing Rights in the food category after August 15, 2007. Each agreement between GM and each Distributor of any rights in the Film in the U.S. shall contain provisions consistent with the terms of this Section 1.2.5(c).

       (d)    Each agreement between GM and each foreign sales agent shall expressly reserve all Marketing Rights to GM other than any that are expressly approved by GM on a case-by-case basis; provided, however, that GM shall not grant any Marketing Rights or other rights to a foreign sales agent or foreign distributor in conflict with the commitments made to Gatorade hereunder.

1.3    Approval Rights – Other Sponsors

       1.3.1    GM will be required to secure Gatorade's written approval prior to the granting of any Marketing Rights with respect to the Film in North America to any

Other Sponsor outside of the Food and Beverage category; provided, however, that such consent shall not be unreasonably withheld for any Other Sponsor if (a) the Producer has disclosed in writing with reasonable specificity the Marketing Rights to be granted (the "Other Sponsor Marketing Rights"), (b) the sponsorship agreement with the Other Sponsor prohibits the Other Sponsor from conducting or exercising any promotional and marketing campaigns, programs or other Marketing Rights within any Gatorade Sales Channel during the Term and (c) such Other Sponsor Marketing Rights could not reasonably be expected to appear in any Gatorade Sales Channel during the Term or otherwise be inconsistent with the rights granted to Gatorade hereunder. For the avoidance of doubt it is understood that (i) the Producer may grant rights to any approved Other Sponsor which are different from, or greater than, any comparable right granted to Sponsor hereunder; provided further, however, that the aggregate of the rights granted to any Other Sponsor shall not be disproportionately greater than the rights granted to Gatorade hereunder relative to the amount and duration of Gatorade's commitment to the Producer and the Film and (ii) Gatorade has been granted exclusivity of Marketing Rights only within the Food and Beverage product category (and, in addition, exclusivity with respect to The Coca Cola Company and its affiliates and as otherwise set forth in Section 1.2.3 above) and exclusivity as to campaigns and promotions appearing or conducted in Gatorade Sales Channels as described in Section 1.2.2 above, and the grant to Other Sponsors of Marketing Rights in other categories and in other sales channels shall not be deemed to diminish or otherwise dilute the rights granted to Gatorade hereunder so long as such Marketing Rights granted to any Other Sponsor could not reasonably be expected to conflict with any specific right granted to Gatorade hereunder. Without limiting Gatorade's approval rights herein, it is acknowledged and agreed that Gatorade shall have the right to object to any Other Sponsor Marketing Rights that grants to the Other Sponsor the right to conduct a campaign, promotion or program of any kind that is to be conducted in any of the Gatorade Sales Channels, or to exercise any Marketing Rights within the Gatorade Sales Channels, during the Term.

        1.3.2  Gatorade shall have the right to approve all Other Sponsor Marketing Rights (such approvals not to be unreasonably withheld as provided in Section 1.3.1).

        1.3.3  In the event that GM cannot secure, in its contract with any particular Distributor of any rights in the Film in North America, a contractual right to approve such Distributor's grant of Other Sponsor Marketing Rights, then GM shall instead secure in such contract a right to meaningfully consult with such Distributor with respect to any proposed grant by the Distributor of Other Sponsor Marketing Rights. GM will exercise such right of meaningful consultation with respect to any proposed grant of Other Sponsor Marketing Rights, and, in connection therewith, Gatorade will have the right to meaningfully consult with GM (and the applicable Distributor) with respect to such proposed grant of Other Sponsor Marketing Rights.

1.4    Media/Marketing/Branding Opportunities

        1.4.1  GM hereby grants to Gatorade all rights to usage of the Film's marks, logos, characters, photography, film footage and any and all other identifying

images related to the Film (the "Gracie Elements") during the Term in any and all media now known or hereafter devised, throughout the world, for any lawful purpose, including, without limitation, for purposes of advertising and promoting Gatorade and its products, subject to the GM approval rights below. (Any materials produced by Gatorade which contain the Gracie Elements, including, without limitation, the items referred to in Section 1.4.2 below, shall be referred to collectively as the "Sponsor Materials.") GM shall provide Gatorade with the Gracie Elements in formats to be mutually agreed upon and in accordance with a mutually agreed upon schedule; it being understood and agreed that, no later than October 6, 2006, GM shall provide Gatorade with the Gracie Elements that Gatorade needs for its Theatrical Promotion (as defined in Section 1.10 below), including, without limitation, the Film's artwork title, logo and key art. GM shall be responsible for obtaining, at its cost, any necessary consents and releases from third parties to enable Gatorade to exploit the Gracie Elements in the Sponsor Materials in accordance with the terms hereof. Without limiting the generality of the foregoing, GM shall be responsible for obtaining, at its cost, any consents and releases from the actors in the Film to enable Gatorade to exploit each actor's name, likeness, picture, voice, performance and biography as embodied in the Gracie Elements in the Sponsor Materials in accordance with the terms hereof. Except as otherwise noted herein, all Sponsor Materials will be produced at Gatorade's cost and expense. Prior to the publication, distribution, or other use of any Sponsor Materials in which the Gracie Elements are incorporated, GM shall have the right to approve the manner in which the Gracie Elements are incorporated in such Sponsor Materials to ensure that the Gracie Elements are used in a manner that is consistent with GM's guidelines for the use of its trademarks, that the Gracie Elements are not used in a manner that is disparaging of the Film and that the Gracie Elements are used in a manner consistent with the Producer's commitments to the actors in the Film (which commitments have been specifically approved by Gatorade as set forth in Section 1.4.9 below and must include that each actor's name, likeness, picture, voice, performance and biography may be used to promote Gatorade's products in connection with a commercial tie-up or tie-in or other promotion of the Film), such approval not to be unreasonably withheld; provided, however, that (i) with respect to any materials submitted to GM prior to November 1, 2006, GM must approve or disapprove such materials within two (2) days (except that, in cases of exigency and at Gatorade's request, GM will use every reasonable effort to approve any submitted materials in a shorter period of time), (ii) with respect to any materials submitted to GM on or after November 1, 2006, GM must approve or disapprove any materials submitted to it within five (5) days (except that, in cases of exigency and at Gatorade's request, GM will use every reasonable effort to approve any submitted materials in a shorter period of time), (ii) GM's failure to respond to any materials within such two-day or five-day period (as applicable) shall constitute GM's approval of such materials, and (iii) in the event that GM disapproves particular materials, GM shall promptly give notice in writing to Gatorade setting out in reasonable detail the specific reasons why GM has disapproved such materials. For purposes of clarity, GM shall not have the right to approve any portion or element of the Sponsor Materials except the manner in which the Gracie Elements are used as set forth in the immediately preceding sentence. Gatorade shall provide GM with the Sponsor Materials in formats to be mutually agreed upon for GM's review and approval in accordance with the terms hereof. Except with respect to the

Gracie Elements, the Sponsor shall be responsible for obtaining any necessary consents and releases from third parties in connection with the Gatorade's use of the Sponsor Materials.

1.4.2   Without limiting the generality of Section 1.4.1 above, Gatorade shall have the right, at its option, to use the Gracie Elements on and in connection with the following Sponsor Materials: all Gatorade product packaging, all point-of-sale materials, and any other advertising or promotional materials (including, without limitation, television commercials, print advertising materials, internet/interactive materials, emails, direct mail materials, etc.).

1.4.3   Gatorade, at its option, shall have the right to require GM to continue, during the Term, to promote Gatorade's official affiliation with the Film on the home web page of the Film's official web site (the "Site"), which is currently located at www.findinggracie.com. All material changes to such promotion shall be approved in writing by Gatorade. GM or its agent will host and maintain the Site continuously during the Term. GM shall remove from the Site the Gatorade name and logo, and/or any references to Gatorade's affiliation with the Film, upon receipt of written notice from Gatorade instructing GM to do the same.

1.4.4   GM will periodically (but in any event at least monthly) notify Gatorade in writing about GM's and the Distributor(s)' plans for (A) merchandising relating to the Film, and (B) any ancillary productions and grass roots programs in conjunction with the Film (collectively, the "Ancillary Productions"), including, but not limited to, any how-to videos, mini-documentaries, behind-the-scenes films, movie soundtracks, and any programs using Convex Group, Inc. platforms, including LidRock (inclusion of mini CD or DVD discs in fountain drink lids), and/or Flexplay (48 hour, no return DVDs permitting time limited, on demand viewing) programs. GM shall provide such written notice in advance of finalizing its plans for merchandising and Ancillary Productions. If, after receipt of any such notice, Gatorade would like to have its marks and logos included in any such merchandising or Ancillary Productions, Gatorade shall so notify GM, and GM will use commercially reasonable efforts to include Gatorade's marks and logos in the applicable merchandising or Ancillary Production to the extent practicable and reasonably appropriate to such item as reasonably determined by GM following meaningful consultation with Gatorade.

1.4.5   Gatorade and GM will in good faith discuss various possible ways of involving Gatorade celebrity talent in the production of the Film and of Ancillary Productions and in advertising and promotion for the Film; it being acknowledged and agreed, however, that Gatorade shall have no obligation to supply its celebrity talent for such endeavors.

1.4.6   At Gatorade's option, GM will provide (at GM's sole cost) the services of the actress who plays the role of "Gracie" to appear at up to five (5) personal appearances. Each appearance shall be up to approximately six (6) hours (exclusive of travel, hair/makeup, meal and break periods) in duration, will take place in location(s) selected by Gatorade in its discretion, and will be scheduled on a date selected by

Gatorade during the period commencing one (1) month prior to the Actual Theatrical Release Date and ending twelve (12) months following the Actual Theatrical Release Date, subject to the actress' prior bona fide professional commitments. The appearances may include, without limitation, appearances at events sponsored or attended by Gatorade, satellite media tours, press conferences, and media interviews. GM will ensure that GM's contract with the actress who plays the role of "Gracie" requires her to attend such appearances (provided that although the appearances may occur at events that promote Gatorade's products, the actress, at such appearances, shall only be required to personally promote any Gatorade products to the extent in connection with a commercial tie-in or tie-up or otherwise contextually appropriate to a promotion of the Film) and that such contract provides that the compensation payable by GM to the actress pursuant to such contract includes any compensation payable to the actress in connection with the appearances; provided, however, that Gatorade shall be responsible for (i) paying for the reasonable travel expenses and reasonable hotel accommodation expenses (room rate and related taxes only) incurred by the actress and up to one (1) person accompanying the actress at such appearances and (ii) providing the actress with a per diem not to exceed $100 per appearance.

       1.4.7 GM will use reasonable good faith efforts to secure the agreement of the actor who will portray the father of "Gracie" to appear at personal appearances on behalf of Gatorade at no cost to Gatorade (other than in respect of travel expenses, hotel accommodations and a per diem).

       1.4.8 At Gatorade's option, GM will provide (at GM's sole cost) the services of Elisabeth Shue to attend, at Gatorade's request, up to three (3) personal appearances (each, an "ES Appearance"), each not to exceed six (6) hours in duration on location (exclusive of travel, hair/makeup, meal and break periods), at various public and private events that are sponsored or attended by Gatorade; it being agreed that such ES Appearances may also include, without limitation, satellite media tours, press conferences, and media interviews and will be scheduled during the period commencing one (1) month prior to the Actual Theatrical Release Date and ending twelve (12) months following the Actual DVD Release Date, subject to Ms. Shue's prior bona fide professional commitments. Gatorade shall have the right to issue press releases and other public relations materials relating to the ES Appearances. Although the appearances may occur at events that promote Gatorade's products, Ms. Shue, at such appearances, shall only be required to personally promote any Gatorade products to the extent in connection with a commercial tie-in or tie-up or otherwise contextually appropriate to a promotion of the Film. GM will ensure that GM's contract with Ms. Shue requires her to attend the ES Appearances, grants to Gatorade the right to use her name, likeness, voice, performances and biography in press releases and other public relations materials relating to the ES Appearances (and any such use to promote Gatorade products shall be permitted only to the extent in connection with a commercial tie-in or tie-up or otherwise contextually appropriate to a promotion of the Film), and provides that the compensation payable by GM to Ms. Shue pursuant to such contract includes any compensation payable to Ms. Shue in connection with the ES Appearances; provided, however, that Gatorade shall be responsible for the reasonable travel expenses and reasonable hotel accommodation expenses (room rate and related taxes only) and reasonable child care expenses for Ms.

Shue's children incurred by Ms. Shue, provided that Gatorade has approved such expenses in advance in writing, and a per diem not to exceed $100 per appearance.

   1.4.9  GM will ensure that GM's contract with each actor in the Film includes (A) the actor's authorization for Gatorade to use any Gracie Elements that include the actor's name, likeness, picture, voice, performance and/or biography in the Sponsor Materials as part of a commercial tie-up or tie-in in accordance with the terms hereof during the Term (but in no event for less than 18 months from the earlier to occur of (i) the first use by Gatorade of any Sponsor Materials and (ii) the theatrical release of the Film in the U.S.), (B) the actor's agreement that, if any use of the Gracie Elements, or the actor's name, likeness, picture, voice, or performance, falls within the jurisdiction of SAG or AFTRA that such actor will execute any standard SAG or AFTRA contracts and accept the minimum scale payments provided for in the applicable SAG or AFTRA agreement, and (C) the actor's agreement that, except as set forth in subsection (B), he or she will not be entitled to any additional compensation in connection with the use of such Gracie Elements and/or the actor's name, likeness, picture, voice, performance, or biography. GM shall provide Gatorade with a copy of the form agreement that it intends to use with the actors, and Gatorade will have the right to approve those sections of such form agreement that pertain to the actor's grant of rights, (including, without limitation, tie-ins and tie-ups), and (if applicable) the actor's services at personal appearances for Gatorade for the purpose of confirming that, in Gatorade's reasonable discretion, such provisions are consistent with GM's obligations hereunder. In addition, if during the course of the negotiation of a contract with a particular actor, GM is asked to make any changes to these provisions (or any others) which might reasonably be construed as limiting or effecting any of the rights granted to Gatorade hereunder, GM will obtain Gatorade's approval prior to making such changes. For the avoidance of doubt, (a) if any actor, in his or her agreement with GM, is given approval over commercial tie-ins or tie-ups, such agreement shall contain a provision in which the actor pre-approves the commercial tie-in and commercial tie-up with Gatorade, and (b) if any agreement with any actor contains a provision pursuant to which GM agrees that no use of the actor's name, likeness, picture, voice, performance, or biography shall be permitted which constitutes a direct endorsement of any product or service, then such agreement shall also contain a provision in which the actor shall acknowledge that any commercial tie-in and tie-up with Gatorade and that any use of the Film's key art by Gatorade shall not constitute an endorsement by such actor which is prohibited by such agreement.

   1.4.10 In the event that GM engages the services of any person (including, without limitation the actress who plays the role of "Gracie") to appear in, or provide services in connection with, the Film, which person is potentially eligible to participate in, and is considering participating in, collegiate, Olympic or other non-professional athletic sports, then (A) GM shall promptly notify Gatorade that such is the case, (B) GM will not take any action that would or might cause such person to be ineligible to participate in collegiate, Olympic or other non-professional athletic sports, and (C) GM shall include, in the agreement with such person, a provision pursuant to which such person releases and indemnifies Gatorade from any claim or liability in the event that such person is ever determined to be ineligible to participate in collegiate, Olympic or other non-professional athletic sports.

1.4.11 Gatorade shall have the option to engage actors from the Film selected by Gatorade to provide services at still photography shoot sessions to take still photographs of the actors for use in the Sponsor Materials, which shoot sessions may occur at any time prior to March 31, 2007 and shall not exceed eight (8) hours in duration each; it being agreed that Gatorade's right to conduct one or more still photography shoot sessions on location during principal photography for the Film shall be subject to GM's production schedule; provided, however, that GM will make the actor(s) selected by Gatorade available for at least one still photography shoot session on location on a mutually agreeable date during principal photography, if Gatorade so desires. Upon Gatorade's request, GM will include in the Production Schedule a date for one (1) still photography shoot session. GM will ensure that GM's contract with each actor includes the following: (A) the actor's agreement to provide services, at Gatorade's request, at the shoot sessions and (B) the actor's agreement that she or he will not be entitled to any compensation from Gatorade in connection with such services and the use of the results and proceeds thereof.

1.4.12 Notwithstanding anything to the contrary contained herein, GM agrees (and all agreements with the actors will provide) that (A) Gatorade shall have the right to continue distributing any product packaging that includes the Gracie Elements after the Term until supplies of such packaging are exhausted, and (B) Gatorade shall not be in breach of this Agreement if any third party continues distributing, displaying, or otherwise using any Sponsor Materials after the Term; provided, however, that in the event that GM provides notice to Gatorade that any such Sponsor Materials remain in public distribution or on public display after the Term, Gatorade agrees to use reasonable good faith efforts to have such Sponsor Materials removed from public distribution or display.

1.4.13 Upon Gatorade's request, GM will provide Gatorade with executed copies of agreements with the actors (which agreements may be redacted to remove the financial terms).

1.5    Product and Brand Placement/Integrations

1.5.1 Gatorade, at its option, will have product placement/integration rights inside the Film and each Ancillary Productions as set forth in this Section 1.5 and Section 1.6, respectively. (For purposes of clarity, the Instructional Video described in Section 1.9 below is an Ancillary Production.)

1.5.2 The manner in which Gatorade's products will be placed or integrated in the Film will be mutually agreed upon after good faith discussion between the parties pursuant to a product placement/integration plan (as supplemented or otherwise modified by mutual agreement of the parties from time to time as provided below, the "Placement Plan"). The initial Placement Plan will be attached hereto as Exhibit A. The manner in which Gatorade's products will be placed or integrated in each Ancillary Productions will be mutually agreed upon after good faith discussion between the parties pursuant to a product placement/integration plan developed by the parties for each such Ancillary Production.

1.5.3  It is understood and agreed that it is the intention of that parties that all placements and integrations shall be "organic" and contextually appropriate and shall, to the greatest extent possible, comply with Gatorade's Placement/Integration Guidelines (which are attached hereto as Exhibit B).

1.5.4  No later than the start of principal photography, Gatorade and GM's key production crew (including, at a minimum, the director, the director of photography, the producer, and UPP) will meet to discuss the Placement Plan and Gatorade's Placement/Integration Guidelines.

1.5.5  Gatorade will, at its option, receive one (1) prominent product placement/integration in each of three (3) scenes in the final Film (each, a "Hero Scene").

(a)  The first Hero Scene shall be a scene in which a soccer game or soccer practice on a soccer field is shown, and in such Hero Scene there shall be at least one (1) on-screen, in-focus identification of the Gatorade brand in a manner that is contextually appropriate (e.g., the display of Gatorade signs, sideline placement of Gatorade-branded coolers or other merchandise, shots of actors drinking Gatorade product, etc.);

(b)  The other two (2) Hero Scenes shall consist of any two (2) of the following, as mutually agreed by Gatorade and GM: (i) up to two (2) scenes in which characters who are visibly hot and sweaty as a direct result of having engaged in vigorous athletic activity are shown quenching their thirst with the Gatorade Thirst Quencher product; and/or (ii) one (1) scene in which the character "Gracie" is depicted practicing kicking soccer balls and using a Gatorade Thirst Quencher bottle as a target.

(c)  In each Hero Scene, the Gatorade Thirst Quencher product will be shown on-screen, in-focus, and for a sufficient duration to ensure that the Gatorade branding and product name will be clearly visible and identifiable; it being acknowledged and agreed that such placements/integrations, including their duration, shall be organic and contextually appropriate.

1.5.6  GM shall have the option, but shall not be obligated, to include, in any scenes in the Film in which a soccer game or soccer practice on a soccer field is shown (i.e., other than the first Hero Scenes described in Section 1.5.5 above), a contextually appropriate placement/integration of the Gatorade brand (e.g., the display of Gatorade signs, sideline placement of Gatorade-branded coolers or other merchandise, shots of actors drinking Gatorade product, etc.); provided, however, that such placements/integrations shall not be prominent.

1.5.7  GM will provide Gatorade with production and post-production schedules for the Film and any material modifications thereto and will notify Gatorade of any material delays in such schedules. Such schedules (and any material modifications thereto) shall clearly identify the days on which GM will film the Hero Scenes and any other scenes in which there will be a Gatorade product placement/integration. Gatorade shall have the right to attend the filming of the Hero Scenes and any other scenes in

which there will be a Gatorade product placement/integration, and GM will give good faith consideration to any suggestions made by Gatorade while attending the filming of such scenes and will permit Gatorade to view the playback and the dailies of such scenes.

    1.5.8  Gatorade will provide GM with Gatorade product, signs, banners, merchandise, and other items for use in the Film and each Ancillary Production, and all such items will be appropriate for the time period in which the Film's or Ancillary Production's (as applicable) story takes place. GM will not use any Gatorade branded products or materials other than those that are specifically provided by Gatorade for the Film.

    1.5.9  Prior to commencement of principal photography of the Film, GM will provide Gatorade with a shot list (and the shooting boards, if any) for each proposed placement/integration for its prior written approval (which shall not be unreasonably withheld); it being agreed that such proposed placement/integrations shall be consistent with the Placement Plan and Gatorade's Placement/Integration Guidelines, unless otherwise agreed in writing by the parties.

    1.5.10 GM shall provide Gatorade with rough cuts of each Hero Scene and of each other scene in the Film that contains any reference to, or use of, any of Gatorade's marks, logos, or products for Gatorade's approval, such approval not to be withheld if the rough-cut of each such Hero Scene or other scene is consistent, in all material respects, with the Placement Plan, Gatorade's Placement/Integration Guidelines, and the terms hereof. Gatorade and the Producer acknowledge that the opportunities and exigencies of shooting the Hero Scenes or any such other scene may give rise to proposed changes to the applicable Hero Scene or other scene at or after the shooting of such scene, and Gatorade and the Producer shall agree to discuss such changes in good faith, it being understood that Gatorade shall have no right to approve any aspect of those scenes other than to confirm compliance with the Placement Plan and Gatorade's Placement/Integration Guidelines in all material respects and the terms hereof.

    1.6    Ancillary Production Integrations

    1.6.1  GM will provide Gatorade with production and post-production schedules for each Ancillary Production and any material modifications thereto and will notify Gatorade of any material delays in such schedules. Such schedules (and any material modifications thereto) shall clearly identify the days on which GM will film any scenes in which there will be a Gatorade product placement/integration. Gatorade shall have the right to attend the filming of any scenes in which there will be a Gatorade product placement/integration, and GM will give good faith consideration to any suggestions made by Gatorade while attending the filming of such scenes and will permit Gatorade to view the playback and the dailies of such scenes.

    1.6.2  Prior to commencement of principal photography of an Ancillary Production, GM will provide Gatorade with a description of and/or renderings of each proposed placement/integration for its prior written approval (which shall not be unreasonably withheld); it being agreed that such proposed placement/integrations shall

be consistent with the placement plan for such Ancillary Production and Gatorade's Placement/Integration Guidelines, unless otherwise agreed in writing by the parties.

1.6.3  GM shall provide Gatorade with rough cuts of each scene in an Ancillary Production that contains any reference to, or use of, any of Gatorade's marks, logos, or products for Gatorade's approval, such approval not to be withheld if the rough-cut of each such scene is consistent, in all material respects, with the applicable placement plan, Gatorade's Placement/Integration Guidelines, and the terms hereof.

1.7    Other Beverage Products

1.7.1  No other branded beverage (other than coffee) will be shown, used, mentioned, or referred to, directly or indirectly, in the Film, any Ancillary Productions, any ancillary rights in the Film, or in any advertising, marketing or promotion thereof.

1.7.2  In addition, in any scenes that take place on a soccer field, in other athletic venues, or in a locker room or in which sports activities or active occasions are depicted (collectively, the "<u>Athletic Scenes</u>"), except as provided in clause 1.7.4 below, no beverage whatsoever (whether branded or unbranded and specifically including, without limitation, water and coffee) other than Gatorade product shall be shown, used, mentioned, or referred to, directly or indirectly, <u>provided</u> that tap water in a drinking fountain may be used in a locker room scene.

1.7.3  In scenes other than the Athletic Scenes, unbranded beverages may be shown or used so long as no packaging (either branded or "generic") for such beverages is shown or used. By way of example, in a scene that takes place in a character's kitchen, GM may show: (i) Gatorade products, (ii) a glass of tap water, (iii) a glass of cola, so long as no branded or generic packaging for such cola is shown and no brand name of such cola is mentioned or referred to, directly or indirectly or (iv) subject to clause (d) below, PepsiCo-branded beverages.

1.7.4  Notwithstanding the foregoing, GM may use PepsiCo-branded beverages which Gatorade has approved in writing for use in the Film in any scenes. Gatorade will use reasonable good faith efforts to assist GM in obtaining PepsiCo branded beverages and other products that have packaging that is appropriate for the time period for GM to use in the Film.

1.8    Executive Producer Credit

1.8.1  At Gatorade's option, up to three (3) individuals designated by Gatorade shall receive an individual executive producer credit on screen in the main titles (wherever such main titles appear) (which credit shall appear on a single card to be shared only with each other) and in paid advertising wherever and whenever the credit to any other producer appears. If Gatorade elects to designate individuals to receive such credit, then all other aspects of such credit shall be mutually agreed upon by Gatorade and GM.

    1.8.2    GM will contractually obligate the Distributor(s) to abide by, and shall notify all other third party distributors of, the credit obligations pursuant to this Section 1.8.

    1.8.3    Gatorade will inform GM in writing as to whether Gatorade would like to exercise its option to designate individual producer credits in accordance with Section 1.8.1 above no later than five (5) days after the day on which Gatorade views a rough cut of the Film.

1.9    The Instructional Video

    1.9.1    In close consultation with Gatorade, GM will, at GM's sole cost (as provided in and subject to Section 1.12), develop and produce a first class instructional soccer film (the "Instructional Video") which shall feature (among others) the actress who plays the character "Gracie." The final Instructional Video will be approximately sixty (60) to ninety (90) minutes in length and will be photographed in high definition digital video. The Instructional Video will include, without limitation, training tips, techniques, and drills for young soccer players, their parents, and coaches and will cover all the important offensive and defensive skills of the game, including ball control, dribbling, shooting, handling, goalkeeping, heading, and passing. The Instructional Video will also contain scientifically sound information regarding the importance of proper hydration and nutrition.

    1.9.2    Gatorade shall own, exclusively, all right, title and interest in and to the Instructional Video throughout the world in any and all media now known or hereafter devised in perpetuity. The Instructional Video, and all the results and proceeds of GM's services in connection therewith, shall be considered specially ordered or commissioned for Gatorade as a work made for hire. In the event that the Instructional Video, or any portion thereof, is considered not to be a work made for hire, GM acknowledges that it has irrevocably assigned to Gatorade, upon its creation, all right, title and interest in and to the Instructional Video and all results and proceeds of GM's services, all to the full extent set forth above.

    1.9.3    No later than August 31, 2006, GM and Gatorade will meet to collaborate on the outline and content of the Instructional Video and the manner in which the Instructional Video will be produced. At such meeting, GM and Gatorade will mutually agree upon a product placement/integration plan which will describe the product placement/integrations for Gatorade in the Instructional Video. Gatorade will provide GM with information regarding the health and performance benefits of proper hydration before, during and after a soccer game or practice, and such information will be incorporated in the Instructional Video. Gatorade will make available to GM a scientist from the Gatorade Sports Science Institute to consult on the scientific content of the Instructional Video. Gatorade and GM will mutually agree upon which applicable SAG or AFTRA agreement, if any, pursuant to which the Instructional Video will be produced, taking into consideration the union membership of any actors or performers who will appear in the Instructional Video.

1.9.4 No later than August 31, 2006, GM shall provide Gatorade with an outline and script for the Instructional Video for Gatorade's prior written approval on or prior to September 15, 2006 (such approval not to be unreasonably withheld).

1.9.5 GM will propose a production budget for the Instructional Video no later than August 31, 2006. Gatorade will have the right to approve the production budget for the Instructional Video on or prior to September 15, 2006 (which approval may be withheld in Gatorade's sole discretion). The parties acknowledge and agree that Gatorade will review and consider the production budget for the Instructional Video in connection with its review and consideration of the manner in which the entire Dedicated P&A Fund (as defined in Section 1.12) will be spent, and that Gatorade will have ultimate control over the manner in which the Dedicated P&A Fund is spent on the expenses set forth in Section 1.12 below, including, without limitation, the portion of the Dedicated P&A Fund that will be allocated to the production budget for the Instructional Video.

1.9.6 Gatorade shall have the right to propose the director, cast, line producer, director of photography, editor, production company, and production designer for the Instructional Video on or prior to August 31, 2006, and to approve others proposed for such positions by the Producer within 5 days of such proposal (such approvals not to be unreasonably withheld). It is agreed that the actress playing the role of "Gracie" will appear in the Instructional Video.

1.9.7 Gatorade shall have the right to approve the production schedule for the Instructional Video; provided that principal photography for the Instructional Video will be completed no later than November 15, 2006. Gatorade shall have the right to attend the filming of the Instructional Video, and GM will give good faith consideration to any suggestions made by Gatorade while attending the filming of the Instructional Video and will permit Gatorade to view the playback and the dailies.

1.9.8 GM and Gatorade will discuss the possibility of Gatorade's providing the services of one or more athletes with whom Gatorade has a relationship to appear in the Instructional Video. The parties will mutually agree upon which, if any, such athletes will appear in the Instructional Video. If Gatorade, in its discretion, agrees to provide the services of any such athlete(s), the compensation for such athlete for his/her services in connection with the Instructional Video (and the costs of travel and accommodations for such athlete) will come out of the production budget for the Instructional Video.

1.9.9 As soon as is reasonably practical, but in no event later than December 15, 2007, GM will provide Gatorade with a first rough cut of the Instructional Video for Gatorade's prior written approval (such approval not to be unreasonably withheld). Gatorade will provide GM with any comments and notes, which GM will revise the Instructional Video accordingly.

1.9.10 As soon as is reasonably practical, but in no event later than January 15, 2007, GM will provide Gatorade with a proposed final edit of the

Instructional Video for Gatorade's prior written approval (such approval not to be unreasonably withheld). In the event Gatorade does not approve such proposed final edit of the Instructional Video, GM will revise the same and resubmit it to Gatorade for approval in accordance with this provision.

1.9.11 The Instructional Video will be completely finished and in all respects ready and of a technical quality adequate for general release on DVDs no later than February 15, 2007 (such DVDs of the Instructional Video, the "<u>Video DVDs</u>"). The Instructional Video will conform to the standards and requirements of the Production Code of the Motion Picture Association of America and will qualify for and receive a rating no more restrictive than "G" by the Code and Rating Administration.

1.9.12 GM and Gatorade will mutually agree upon any bonus features or additional materials that will be included on the Video DVDs. The parties hereby preapprove the inclusion of the following on the Video DVD: (A) the theatrical trailer for the Film and (B) Gatorade's commercial advertisements.

1.9.13 GM, at its sole cost (as provided in and subject to Section 1.12), will reproduce the Instructional Video (and any mutually agreed upon bonus features) on such number of Video DVDs as Gatorade shall request for the Theatrical Promotion pursuant to Section 1.10.5 below. Gatorade will have the right to order copies of the Video DVDs as provided in Section 1.10.5 in batches, and GM will deliver each batch no later than three (3) weeks following the order.

1.9.14 GM, at its sole cost (as provided in and subject to Section 1.12), will develop, design and produce packaging for the Video DVDs. GM and Gatorade will mutually agree upon the packaging for the Video DVD, including, without limitation, the manner in which the Gatorade name and logo and the Film's name and logo will appear on such packaging. GM will produce packaging for the each copy of the Video DVDs ordered by Gatorade as provided herein.

1.9.15 Without limiting the generality of the foregoing (including, without limitation, Section 1.9.2), Gatorade will have the right to distribute, sell and use the Video DVDs as a premium for the Theatrical Promotion described in Section 1.10 below and to broadcast, exhibit, distribute, perform and otherwise use stills and excerpts of the Instructional Video in connection with the advertising and promotion of the Theatrical Promotion described in Section 1.10 below and in the Sponsor Materials.

1.9.16 It is acknowledged and agreed that the Instructional Film delivered by GM hereunder may contain certain Gracie Elements, footage of the actress playing "Gracie" and references to the Film. Without limiting the generality of Section 1.9.2 above, Gatorade will have the right to broadcast, edit, exhibit, distribute, sell, perform and otherwise use the Instructional Video (as well as any versions of the Instructional Video produced by Gatorade), or any parts thereof or any elements therefrom, in any manner and in any and all media now known or hereafter devised in perpetuity throughout the world; <u>provided, however,</u> that Gatorade shall not have the right to broadcast, edit, exhibit, distribute, sell, perform and otherwise use any version(s) of the

Instructional Video which includes the Gracie Elements, footage of the actress playing "Gracie" and/or references to the Film after the expiration of the Theatrical Promotion described in Section 1.10 below without GM's prior written approval.

1.9.17 Subject to and as provided in Section 1.12, GM shall be responsible for all costs in connection with the development and production of the Instructional Video, the reproduction of the Instruction Film (and any mutually agreed upon bonus features) on the Video DVDs, and the packaging for the Video DVDs.

1.9.18 Gatorade will inform GM if Gatorade wishes to receive producer, logo or other credit(s) in the Instructional Video, and, if so, GM and Gatorade will mutually agree upon such credit(s) following good faith negotiation.

1.9.19 Without limiting any of GM's representations, warranties, and agreements contained herein with respect to the Instructional Video, GM agrees that it will not, without Gatorade's prior approval in each instance, include any material in the Instructional Video which will restrict or limit Gatorade's ability to exploit or otherwise use the Instructional Video.

1.9.20 Upon Gatorade's request, GM will deliver to Gatorade (1) the master for the Instructional Video and all other original elements, and (2) original copies of any third party agreements, releases, and licenses relating to the Instructional Video.

1.10   Theatrical Promotion

1.10.1 Theatrical Release.  GM will cause the Film to be released initially as follows (collectively, the "Theatrical Release Commitment"):

(a)   The Film will be released in motion picture theaters in the United States on either June 1, 2007 or June 8, 2007;

(b)   The Film will be released on a minimum of 750 screens throughout the continental United States during the three (3) week period commencing on the Actual Theatrical Release Date (as defined below);

(c)   The Film will be released on a minimum of 500 screens throughout the continental United States on the Actual Theatrical Release Date; and

(d)   The Film will be released in each of the markets listed on Exhibit D to this Agreement so the Film has a meaningful presence in each of those markets.

The actual date on which the Film is released theatrically in the U.S. shall be referred to herein as the "Actual Theatrical Release Date." GM will notify Gatorade in writing of the Actual Theatrical Release Date upon the earlier to occur of (A) the date on which GM receives notice of the Actual Theatrical Release Date from the Distributor and (B) December 1, 2006.

1.10.2 Gatorade shall have the right to conduct a retail promotion that coincides with the theatrical release of the film (the "Theatrical Promotion") beginning in approximately March/April of 2007 and ending in approximately September of 2007. The Theatrical Promotion will be a sales incentive promotion pursuant to which consumers who purchase a designated Gatorade Thirst Quencher multi-pack (the "Multi-pack") during a specific period, and in accordance with specified terms and conditions, will receive the Video Offer described in Section 1.10.3. Each such consumer who purchases a Multi-pack will receive instructions as to how to redeem the Video Offer. By way of example, Gatorade may elect to provide each consumer with a unique code (or a semi-unique code) which can be used to redeem the Video Offer, and, if Gatorade so elects, Gatorade will determine the manner in which such code will be included on or in each Multi-pack. (For example, Gatorade may, at its election, insert into each Multi-pack a "game piece" that includes the unique code or Gatorade may print the unique code on the packaging for the Multi-pack.) Gatorade shall consult with GM (and the U.S. Distributor) regarding the details of the Theatrical Promotion; provided, however, that Gatorade will have final control over all aspects of the Theatrical Promotion.

1.10.3 In the Theatrical Promotion, consumers who purchase the Multi-pack in accordance with the terms and conditions of the Theatrical Promotion will receive an offer to obtain a Video DVD (the "Video Offer"). Gatorade shall determine whether consumers will be required to pay any amount to redeem the Video Offer to cover (in whole or in part) shipping, handling and fulfillment costs or whether such shipping, handling and fulfillment costs (or a portion thereof) will be paid for out of the Dedicated P&A Fund described in Section 1.12 below. If Gatorade determines that consumers will be required to pay an amount to cover (in whole or in part) shipping, handling and fulfillment costs, Gatorade will determine such amount following a determination of Gatorade's actual shipping, handling and other fulfillment costs related to the Video Offer which are not reimbursed pursuant to Section 1.12. Unless otherwise agreed, all such proceeds of the Video Offer shall be retained by Gatorade to reimburse such costs.

1.10.4 Upon Gatorade's request, GM will permit Gatorade to view any early rough cut or assembly of the Film, the Instructional Video or other work in progress.

1.10.5 The parties acknowledge and agree that the opportunity to conduct the Theatrical Promotion is a material inducement for Gatorade to enter into this Agreement, and that Gatorade must have sufficient quantities of the Video DVD in its possession in order to fulfill orders for the Video DVDs. Accordingly, subject to Section 1.12, no later than April 1, 2007, GM will provide Gatorade, at no cost to Gatorade, with thirty thousand (30,000) copies of the Video DVD (or such other number of copies as Gatorade shall request) for use in connection with the Theatrical Promotion. In addition, during the Term, GM will supply Gatorade, at no cost to Gatorade, subject to Section 1.12, with such number of additional copies of the Video DVD that Gatorade shall require to fulfill the Theatrical Promotion. Gatorade will have the right to order additional copies of the Video DVDs in batches, and GM will deliver each batch no later than three (3) weeks following the order.

1.10.6 Provided that GM complies with its obligations pursuant to this Agreement, that the Film is released in theaters in accordance with the Theatrical Release Commitment, that Gatorade's retailers who sell the Multi-pack agree to participate in the Theatrical Promotion, and that Gatorade is able to design the Theatrical Promotion so it complies with all applicable laws, Gatorade will conduct the Theatrical Promotion and promote the Theatrical Promotion on special packaging that will be used on a minimum of 2,000,000 units of the Multi-pack that will be distributed in the United States beginning on approximately May 1, 2007.

1.11  Theatrical Promotion Website.

(a)  Gatorade (or its agents) will produce and maintain a dedicated website for the implementation and fulfillment of the Theatrical Promotion (the "Promotion Website"). Gatorade shall consult in a meaningful way with GM (and the U.S. Distributor) regarding the layout and content of the Promotion Website; provided, however, that Gatorade will have final control over all aspects of the Promotion Website.

(b)  The Promotion Website will, among other things, permit each consumer who is trying to redeem the Video Offer to enter his or her unique code, name, and address. At GM's request, Gatorade will share any and all such information with GM and authorizes GM to use such information solely to promote the Film and any New Work, provided that such sharing is permitted by the terms of Gatorade's privacy policy and applicable law, and provided further that GM adheres to the terms and conditions of Gatorade's privacy policy, applicable law and any other terms and conditions that Gatorade reasonably imposes upon GM with respect to is use of such information.

(c)  The Promotion Website will inform consumers as to how they can redeem the Video Offer.

(d)  All reasonable and third party costs associated with the development, production and maintenance of the Promotion Website (the "Promotion Website Costs") will be paid for by GM as provided in and subject to Section 1.12.

(e)  Gatorade may, at its election, involve one or more third parties in the Theatrical Promotion, and if Gatorade chooses to do so, Gatorade will be responsible for contracting with such third parties.

(f)  GM shall secure any necessary releases and permissions to incorporate, reproduce, display and perform, on the Promotional Website, any elements supplied by GM for the Promotional Website.

1.12  Dedicated P&A Fund.

1.12.1 GM will dedicate and reserve (and GM will notify (and, to the extent required, obtain the approval of) the U.S. Distributor, Octave Entertainment Fund, Ltd. ("Octagon"), and any other necessary third parties of such reserve) at least Seven Hundred and Fifty Thousand Dollars ($750,000) of Octagon's financing commitment to

GM for P&A loans (such reserve, the "Dedicated P&A Fund") for use solely for the following actual costs:

 (a) The third party costs incurred by Gatorade to develop, produce, fulfill, and execute the Theatrical Promotion, including, without limitation, the fees, commissions, and other amounts charged to Gatorade by agencies and other third parties in connection with the Theatrical Promotion and the costs of shipping, handling and fulfillment of the Video Offer which are not paid for by consumers redeeming the Video Offer;

 (b) The reasonable third party costs incurred by Gatorade in connection with the development, production, and maintenance of the Promotional Website;

 (c) The third party production costs incurred by GM as provided in Section 1.9 for the Instructional Video;

 (d) The third party costs incurred by GM to design the packaging and manufacture the Video DVDs and the packaging for such Video DVDs;

 (e) The costs incurred by Gatorade to print, insert or otherwise distribute the unique (or semi-unique) codes for the Theatrical Promotion on or in the Multi-packs, if Gatorade elects to use unique (or semi-unique) codes; and

 (f) The third party costs incurred by Gatorade to develop, produce, fulfill, and execute the Music Promotion (described in Section 1.13 below), including, without limitation, the costs of purchasing the 60,000 Song Downloads (as defined in Section 1.13 below) for the Music Promotion, subject to Section 1.13 below.

 1.12.2 Prior to September 15, 2006, GM and Gatorade shall meet and discuss in good faith the manner in which the Dedicated P&A Fund will be spent on the above expenses; provided, however, that in the event of a disagreement between Gatorade and GM over the manner in which the Dedicated P&A Fund is spent on the above expenses, Gatorade's decision shall control. The Dedicated P&A Fund may not be used for any costs other than those set forth in this Section 1.12 without both GM's and Gatorade's prior written approval. No later than 45 days after Gatorade shall submit an invoice to GM for any such costs set forth in this Section 1.12, GM shall pay (or reimburse Gatorade for) such invoiced amount. For purposes of clarity, Gatorade shall have the right to invoice GM reasonably in advance of the date(s) that it expects to incur any of the costs set forth in this Section 1.1.2 so Gatorade will have funds available to pay such costs as they are incurred. GM's obligation to reimburse Gatorade for costs and expenses in connection with the Theatrical Promotion shall be limited to its obligations pursuant to this Section 1.12.

 1.12.3 Gatorade shall have the right to approve the "P&A Loan Schedule" as such term is defined in the Octagon Agreement (as defined below).