# EXHIBIT B (part 2)

1.13    Music Promotion

1.13.1  Gatorade shall have the right, but not the obligation, to conduct a music promotion (the "Music Promotion") pursuant to which customers who purchase identified Gatorade products at one or more retailers selected by Gatorade, and who comply with the other terms and conditions of the Music Promotion, can download for free one or more songs (as determined by Gatorade) from the soundtrack for the Film (each, a "Song Download") via an online music service (such as, by way of example only, Wal-Mart's online delivery service). If Gatorade elects to go forward with the Music Promotion, Gatorade shall consult with GM (and the U.S. Distributor) regarding the details of the Music Promotion; provided, however, that Gatorade will have final control over all aspects of the Music Promotion.

1.13.2  If Gatorade elects to go forward with the Music Promotion, then Gatorade will determine, in its discretion, whether to use a portion of the Dedicated P&A Fund to pay for some or all of the costs of the 60,000 Song Downloads. Gatorade will be responsible for paying for any portion of the costs of the 60,000 Song Downloads that is not paid for out of the Dedicated P&A Fund.

1.13.3  If Gatorade elects to go forward with the Music Promotion, No later than January 15, 2007, GM will provide Gatorade with a list of at least six (6) songs from the soundtrack of the Film that will be available as Song Downloads for the Music Promotion. Gatorade shall have the right to approve such list.

1.13.4  If Gatorade elects to go forward with the Music Promotion, GM shall be responsible for securing all necessary rights and permissions to permit Gatorade to use the Music Downloads in the Music Promotion and to refer to the Music Downloads (including, without limitation, the song titles and artists' names) in advertising and marketing relating to the Music Promotion (including, without limitation, any necessary rights and permissions from music labels, music publishers, and artists).

1.13.5  If Gatorade elects to go forward with the Music Promotion, Gatorade will make all necessary arrangements with the retailer(s) selected by Gatorade to participate in the Music Promotion.

1.14    Other Promotions in Connection with the Theatrical Release

Subject to the other terms and conditions of this Agreement, Gatorade shall have the right, but not the obligation, to conduct one or more additional consumer promotions in connection with the theatrical release of the Film. Gatorade shall consult with GM (and the U.S. Distributor) regarding the details of any such additional consumer promotion; provided, however, that Gatorade will have final control over all aspects of such promotion; provided further, that GM shall have the right to confirm that such promotions are not inconsistent in any material respects with the Distributor's marketing plans for the Film.

1.15     Screenings of the Film

Gatorade shall have the option to conduct up to three (3) special screenings of the Film for its employees, retailers, consumers, and other invited guests; provided that each screening shall be for no more than 500 persons. GM shall make available, or cause the Distributor to make available, prints of the Film for such screenings at no cost to Gatorade. Gatorade will be responsible for all other costs in connection with such screenings.

1.16     DVD Release of the Film

1.16.1 GM will cause the Film to be released in the United States on DVD (and other formats suitable for home viewing) no later than six (6) months following the Actual Theatrical Release Date. The date on which the DVD of the Film is released shall be referred to herein as the "Actual DVD Release Date." GM will notify Gatorade in writing of the Actual DVD Release Date as soon as such date has been determined.

1.16.2 Gatorade shall have the option to request and GM shall use commercially reasonable efforts to cause the Distributors to include (a) material supplied by Gatorade as "extra" features on the DVD of the Film, and/or (b) coupons or other promotional material that is packaged in the DVD of the Film. Such material may include, for example, Gatorade commercials, Gatorade PSAs, other sports-related content supplied by Gatorade (e.g., a film concerning the "Get Kids in Action" program or a film with a soccer clinic), or coupons for a discount on specified Gatorade products; provided, however, that it is acknowledged and agreed that the U.S. Distributor may not approve the inclusion of Gatorade commercials as "extra" features on the DVD of the Film. No later than February 1, 2007, GM, Gatorade and the Distributors will meet to discuss whether Gatorade will exercise this option, what material (if any) Gatorade would like to include on and in the DVD of the Film, and the date by which Gatorade must provide such material to GM and/or the Distributors.

1.16.3 Subject to the other terms and conditions of this Agreement, Gatorade shall have the option to conduct one or more (as determined by Gatorade) consumer promotions in connection with the release of the DVD of the Film (each, a "DVD Promotion"). Gatorade shall consult with GM (and the Distributor) regarding the details of any DVD Promotion; provided, however, that Gatorade will have final control over all aspects of the DVD Promotion; provided further that GM shall have the right to confirm that such promotions are not inconsistent in any material respects with the Distributor's marketing plans for the Film.

1.17     Other Marketing Programs/Rights

Gatorade and GM, in good faith, will discuss any and all other marketing opportunities that GM and/or Gatorade seeks to execute during the Term in respect of the Film and will make every commercially reasonable effort to cooperate with each other in connection with such programs.

1.18    Premiere Tickets

GM shall provide Gatorade with 35 tickets to each of the east coast and west coast premieres of the Film in the United States.

1.19    Premiere Event

Gatorade, at its option, will have the right to conduct a promotional event at at least one of the Film's celebrity premieres that takes place in the U.S. In the event that Gatorade wishes to conduct any such event, GM and Gatorade will mutually agree upon all of the details concerning such event.

2.    **Additional GM Obligations**

GM shall ensure that the following production requirements, and other requirements and obligations, are fully satisfied:

2.1    GM will present the final screenplay for the Film to Gatorade for its prior written approval (the "Screenplay"), such approval not to be unreasonably withheld. It is acknowledged that Gatorade has approved the draft of the Screenplay dated July, 2005. The final Film will be based on the approved Screenplay and shall strictly follow the same in all material respects; provided, however, that it is acknowledged and agreed that GM shall have the right to make changes to the approved Screenplay during the course of production, provided that such changes do not alter the plot, storyline, tone, or basic relationship of the principal characters in any material respect (any such change as would materially alter the plot, storyline, tone, or basic relationship of the principal characters is referred to herein as a "Material Inconsistency"); and provided further that Gatorade will have the right to approve any changes to the Screenplay which would result in a Material Inconsistency;

2.2    GM will present the budget for the Film (the "Budget") and the cash flow schedule (the "Cash Flow Schedule") to Gatorade for its prior written approval, such approval not to be unreasonably withheld if consistent with the budget and cash flow information provided by GM to Gatorade prior to the date hereof (and such final Budget and Cash Flow Schedule shall be attached to this Agreement as Exhibit C). GM will spend, at a minimum, the amounts allocated in the Budget for the production of the Film. For purposes of clarity, GM if the actual production costs for the Film exceed the Budget, GM will be responsible for all overages;

2.3    GM will provide Gatorade with the production and post-production schedules and any material modifications thereto and will notify Gatorade of any material delays in such schedules. For purpose of clarity, such production schedules (and any material modifications) shall clearly identify the days on which the Hero Scenes will be filmed and the days on which any other scenes will be filmed in which a Gatorade product integration/placement will be filmed. If at any point GM believes that it will have difficulty delivering the final Film in accordance with the terms of the Distribution Agreement and/or satisfying any of the delivery or other requirements set forth in the Distribution Agreement, GM will promptly notify Gatorade of the same;

2.4    The Film shall be a feature-length theatrical motion picture of no less than 90 minutes and no more than 120 minutes (inclusive of main and end titles); photographed in color using 35mm raw stock negative film; and produced, recorded (not dubbed) and delivered in the English language;

2.5    The Film will conform to the standards and requirements of the Production Code of the Motion Picture Association of America and will qualify for and receive a rating no more restrictive than "PG-13" by the Code and Rating Administration;

2.6    The Film will be completely finished and in all respects ready and of a technical quality adequate for general release in first class theaters throughout the universe no later than the delivery date set forth in the Distribution Agreement and will otherwise be in full compliance with all technical delivery requirements set forth in the Distribution Agreement.

2.7    GM will submit a rough cut of the Film to Gatorade for its review and written approval, such approval not to be withheld if there are no Material Inconsistencies between the Film and the approved Screenplay and if the product placements and integrations are consistent, in all material respects, with the Placement Plan, Gatorade's Placement/Integration Guidelines, and the terms hereof.  In the event Gatorade does not approve such rough cut, Gatorade shall specifically identify in writing any Material Inconsistencies with the Screenplay or any aspects thereof which it has determined are materially inconsistent with the Placement Plan or Gatorade's Placement/Integration Guidelines, as applicable.  Following any such notice, GM will revise the same to address any such inconsistent matters and resubmit it to Gatorade for approval in accordance with this provision, but only if any delay occasioned by any such required revision shall be permitted by the Distribution Agreement, the agreement with the Completion Guarantor, and any applicable loan agreement to which the Producer is a party; provided, however that if GM fails to revise the rough cut and resubmit it to Gatorade for its approval in accordance with this provision, then such failure shall constitute a material breach of this Agreement entitling Gatorade, at its election, to a full refund of the Marketing Payment pursuant to Section 6 below and/or to terminate this Agreement pursuant to Section 12 below.  GM will provide Gatorade with the rough cut of the Film as soon as is reasonably practical and sufficiently in advance of GM's delivery date to enable Gatorade to have a reasonable period of time to review the rough cut and for GM to address Gatorade's comments, if any; provided, however, that GM shall provide Gatorade with the rough cut no later than January 15, 2007.

2.8    GM will secure all necessary rights, clearances, and releases in connection with the Film and the Instructional Video and the rights granted hereunder to Gatorade, including, without limitation, with respect to the acquisition of all literary or other material on which the Film and Instructional Video are based, licenses to all music and other elements included in the Film and Instructional Video, and all actors and other individuals engaged to provide services in connection with the Film and Instructional Video.

2.9     GM and the U.S. Distributor will spend at least $13,000,000 on prints and advertising ("P&A") for the initial theatrical release of the Film in the United States. If audience testing for the Film is positive (determined as provided in the Distribution Agreement with the U.S. Distributor), then GM and the U.S. Distributor will spend not less than an additional $2,000,000 on P&A for such initial theatrical release. No later than August 31, 2006, GM will present to Gatorade its P&A funding plan (as supplemented and amended from time to time as provided herein, the "P&A Plan"), and Gatorade will have the right to meaningfully consult with GM regarding such P&A Plan and any proposed changes thereto. GM shall ensure, and the P&A Plan shall reflect, that (A) $600,000 of the P&A shall be dedicated to the Dedicated P&A Fund, as described in Section 1.12 above and (B) there is a fair allocation of the amount spent on P&A in each market in the United States and that a reasonable amount will be spent on P&A in the markets listed on Exhibit D to this Agreement.

2.10     Gatorade shall have the right to meaningfully consult with GM and the Distributor regarding the marketing campaign, programs and materials for the Film.

2.11     GM will cause the Film to be released in accordance with the Theatrical Release Commitment.

2.12     Gatorade shall have the right to approve the location(s) for the Film, such approval not be unreasonably withheld if such locations are reasonably consistent with the Product Placement/Integration provisions under Section 1.5 above.

2.13     Prior to commencement of principal photography, GM shall notify Gatorade of the identity of the persons performing the following functions in connection with the Film:

2.13.1     The actors playing the roles of Gracie's love interest, Gracie's mother, and Gracie's father;

2.13.2     The director of photography;

2.13.3     The editor; and

2.13.4     The production designer.

2.14     GM shall furnish, or cause to be furnished, to Gatorade each of the financial statements, reports and notices that GM is required to furnish, or cause to be furnished , to Octagon, pursuant to paragraphs 5.01 and 5.04 of the Financing Agreement dated as of August 18, 2006 (as in effect from time to time, the "Octagon Agreement"), between GM and Octagon, with such financial statements, reports and notices to be provided to Gatorade at the same time they are furnished to Octagon.

2.15     GM shall comply with the obligations set forth in section 5.06 of the Octagon Agreement.

2.16    GM shall maintain books and records in accordance with the requirements set forth in, and Gatorade shall have the same audit rights granted to Octagon, as described in section 5.08 of the Octagon Agreement.

2.17    Upon the request of the Gatorade, GM shall duly execute and deliver, or cause to be duly executed and delivered, at the cost and expense of GM, such further instruments as may be necessary in the reasonable judgment of the Gatorade to carry out the provisions and purposes of this Agreement.

2.18    As soon as reasonably practical, GM will provide Gatorade with the names and addresses of the theaters in which the Film will be playing initially.  During the period the Film is playing in theaters, GM, at Gatorade's request, will provide Gatorade with updated information on a "real time" basis regarding the names and addresses of theaters in which the Film is playing (or will be playing in the future).

2.19    Gatorade's approval of any agreement that it is entitled to approve hereunder shall not relieve GM of any of its various direct commitments and obligations hereunder or constitute a waiver by Gatorade of any of its rights or remedies (other than a waiver of its right to disapprove the agreement in question).

3.      **Distribution Agreement**

3.1    GM and each Distributor with respect to the North American Territories shall fully execute a Distribution Agreement on or before August 31, 2006.  Each such Distribution Agreement shall be subject to the written approval of Gatorade, such approval not to be withheld if the following commitments set forth in this Section 3 are included and if such Distribution Agreement does not conflict with any of GM's obligations hereunder.  Gatorade's approval of a Distribution Agreement that does not include all of the following commitments set forth in this Section 3 shall not relieve GM of any of its various direct commitments and obligations hereunder or constitute a waiver of any of Gatorade's other rights or remedies (other than a waiver of the right to disapprove the Distribution Agreement due to its failure to include all of the following commitments set forth in this Section 3).

3.2    The following commitments shall be included in each Distribution Agreement for the North American territories:

3.2.1    Gatorade shall be a third party beneficiary of the Distribution Agreement with respect to the Distributor's obligation to honor the Theatrical Release Commitment (as described in Sections 3.2.2 and 3.2.3 below);

3.2.2    Distributor makes a firm commitment to release the Film in theaters in the United States on either June 1, 2007 or June 8, 2007, and such commitment is subject to no contingencies (other than the delivery of the Film in accordance with the Distribution Agreement and force majeure events);

3.2.3    Distributor makes a firm commitment to release the Film in accordance with The Theatrical Release Commitment;

3.2.4   Distributor makes a firm commitment to release the Film on DVD (and other formats suitable for home viewing) in the United States no later than six months following the Actual Theatrical Release Date;

3.2.5   (A) Distributor acknowledges and agrees that Gatorade shall have all of the rights and benefits set forth in this Agreement in connection with the Film and the Instructional Video, (B) Distributor agrees that it will not interfere with Gatorade's exercise or enjoyment of any of such rights and benefits, and (C) to the extent applicable, Distributor will cooperate with GM and Gatorade to ensure that Gatorade is able to exercise and enjoy such rights and benefits.

3.2.6   Without limiting the generality of Section 3.2.5, Distributor acknowledges and agrees that (A) Gatorade shall have the right to conduct the Theatrical Promotion as described herein, (B) the Dedicated P&A Fund will be available and only be used for the costs set forth in Section 1.12 above, and (C) the Distributor will be bound by the exclusivity commitment set forth in Section 1.2 above.

**4.     Conditions Precedent.**

Gatorade's obligations pursuant to this Agreement are strictly contingent upon the following occurring prior to August 28, 2006:

4.1     Gatorade approves in writing the final draft of the Screenplay (It is acknowledged that Gatorade has approved the draft of the Screenplay dated July, 2005. If the Screenplay is subsequently changed in a way which would result in a Material Inconsistency, Gatorade shall have the right to approve such change.);

4.2     The Budget shall not be less than $9,500,000, the production schedule shall not be shorter than 35 days, and Gatorade shall have approved chain-of-title for the Film;

4.3     GM secures written agreements or commitments, which Gatorade has approved as to form and substance, from (i) Other Sponsors and other third parties that will be providing the remainder of the funding for the Budget (i.e., a minimum of $5.25 million), and (ii) Octagon which will provide at least $13,000,000 in funding for P&A for the initial theatrical release of the Film in the United States, with an additional $2,000,000 available as provided in Section 2.9;

4.4     Octagon executes, and provides to Gatorade, an unconditional guaranty, in form and substance satisfactory to Gatorade, of GM's obligation to repay the Additional Marketing Payment as set forth in Section 5.2 below.

4.5     GM secures a fully-executed completion guarantee which Gatorade has approved as to form and substance (the "Bond") from a reputable guarantor of completion (the "Completion Guarantor") approved by Gatorade to ensure the delivery the Film;

4.6     A customary inter-party agreement(s), in customary form and substance acceptable to Gatorade, is fully executed by GM, the Distributor, the Completion Guarantor, Gatorade, Octagon, the New Jersey Economic Development Authority (the "Authority") and any other relevant parties (the "Inter-Party Agreement");

4.7     Gatorade approves in writing the persons performing the following functions in connection with the Film, GM engages such persons on a pay or play basis pursuant to fully-executed written agreements, and Gatorade has approved those agreements (such approval not to be unreasonably withheld):

    4.7.1   The director (Davis Guggenheim is hereby approved);

    4.7.2   The actors playing the roles of Gracie (Carly Schroeder is hereby approved), and Gracie's mother (Elisabeth Shue is hereby approved); and

    4.7.3   The line producer (Caroline Jascko is hereby approved);

4.8     GM and Elisabeth Shue fully execute an agreement or otherwise satisfactorily evidence agreement as to the matters set forth herein, including, without limitation, in Sections 1.4.8, 1.4.9, and 1.4.11;

4.9     The Distribution Agreement with each Distributor with respect to the North American territories is approved in writing by Gatorade in accordance with Section 3 above, and GM and each such Distributor execute the Distribution Agreement;

4.10    GM delivers to Gatorade the certificates of insurance and a copy of the insurance policy required to be delivered to GM pursuant to this Agreement;

4.11    GM delivers to Gatorade the Security Documents required to be delivered pursuant to Section 7 below;

4.12    GM provides Gatorade with copies of all of the agreements and other documents set forth in this Section; and

4.13    Gatorade has received copies of the "Organization Documents" described in section 4.01(d) of the Octagon Agreement and such Organization Documents are approved by Octagon as satisfactory.

5.     **Gatorade Payment Terms**

    5.1     Marketing Payment.

        Subject to satisfaction of the conditions precedent set forth in Section 4 above, in exchange for the rights and benefits provided to Gatorade as outlined herein, and provided GM is not in breach of any of its obligations hereunder, Gatorade shall pay GM, in total consideration, One Million Seven Hundred and Fifty Thousand Dollars ($1,750,000) (the "Marketing Payment"), payable under the following terms:

5.1.1  GM acknowledges receipt of Six Hundred Thousand Dollars ($600,000). These monies have been, or will be, used solely for pre-production of the Film, including script revisions, casting, administration, and pre-production (see attached Budget).

5.1.2  The balance of One Million One Hundred and Fifty Thousand dollars ($1,150,000) shall be paid into an account satisfactory to the Completion Guarantor upon the satisfaction of all conditions precedent.

5.2     Additional Marketing Payment.

Subject to satisfaction of the conditions precedent set forth in Section 4 above and in this Section 5.2, in exchange for the rights and benefits provided to Gatorade as outlined herein, and provided GM is not in breach of any of its obligations hereunder, Gatorade shall pay GM an additional Two Million Five Hundred Thousand Dollars ($2,500,000) (the "Additional Marketing Payment"). No later than December 15, 2006, GM shall repay to Gatorade $500,000 of the Additional Marketing Payment. No later than the date which is fifty (50) weeks following GM's receipt of the Additional Marketing Payment, GM shall repay to Gatorade the remaining $2,000,000 of the Additional Marketing Payment. Gatorade's payment to GM of the Additional Marketing Payment is contingent upon Octagon's having executed, and provided to Gatorade, an unconditional guaranty, in form and substance satisfactory to Gatorade, of GM's obligation to repay the Additional Marketing Payment in accordance with the terms hereof.

5.3     GM commits that the $1.75 million from Gatorade pursuant to Section 5.1, the entire Additional Marketing Payment, and the $5.25 million from additional investors will be used for production of the Film in accordance with the Budget.

6.     **Identified Material Breaches**

6.1     It is acknowledged and agreed that each of the following shall constitute a material breach of this Agreement (each, an "Identified Material Breach"):

6.1.1  If the final Film is not consistent with the approved Screenplay in all material respects as provided in Section 2.7;

6.1.2  If the product placements and integrations in the final Film are not consistent, in all material respects, with the Placement Plan, Gatorade's Placement/Integration Guidelines, and the terms hereof as provided in Section 2.7;

6.1.3  The failure to achieve acceptance of the Film pursuant to the terms of the Distribution Agreement in time for the U.S. Distributor to release the Film on either June 1, 2007 or June 8, 2007;

6.1.4  The failure to release the Film in theaters in accordance with the Theatrical Release Commitment;

6.1.5  The failure of the Film to receive a rating no more restrictive than "PG-13" by the Code and Rating Administration of the Motion Picture Association of America;

6.1.6  The failure to produce and deliver an Instructional Video in material compliance with Section 1.9;

6.1.7  The failure to deliver the quantities, as requested by Gatorade, of the Video DVDs in accordance with the terms of Section 1.10.5;

6.1.8  The failure to spend at least $13,000,000 on P&A for the initial theatrical release of the Film in the United States (or if the condition set forth in Section 2.9 is satisfied, $15,000,000) in accordance with the terms hereof;

6.1.9  If any "Default" or "Event of Default" under the Octagon Agreement (as such terms are defined in the Octagon Agreement) shall occur and be continuing unremedied or unwaived for a period of 45 days;

6.1.10  The failure to make the Dedicated P&A Fund available for use in accordance with the terms hereof; and

6.1.11  The failure to spend the amount allocated in the approved Budget on the production of the Film, except to the extent that the Completion Guarantor has approved otherwise.

6.2  Without limiting any of Gatorade's rights hereunder, at law or in equity, in the event of the occurrence of any Identified Material Breach set forth in Section 6.1, (a) GM agrees to refund to Gatorade the Marketing Payment in full, and (b) Gatorade will have the right to demand immediate repayment of the entire Additional Marketing Payment.

6.3  For purposes of clarity, nothing contained in this agreement shall limit Gatorade's right to indemnification pursuant to Section 9 below in the event of any third party claims arising from or relating to an Identified Material Breach.

7.  **Copyright Mortgage and Security Interest**

7.1  As used herein, "Collateral" shall be defined as the Screenplay (and all versions thereof) and the Film, and all right, title and interest in and to the Screenplay and the Film and all parts thereof and all rights relating thereto (including, without limitation, all domestic and foreign copyrights in the Film and all of the literary and artistic material upon which the Film is based).

7.2  GM hereby grants to Gatorade a copyright mortgage and security interest in the Collateral (the "Security Interest") to secure all of GM's obligations under this Agreement, including, without limitation, the obligation to deliver the Film and the Instructional Video and to further secure against any material breach of any representation, warranty or agreement made by GM in this Agreement and to secure

Gatorade's right to continued undisturbed quiet enjoyment of the rights granted hereunder in accordance with this Agreement (collectively, the "Obligations"). Gatorade's Security Interest shall be subordinate only to the respective security interests of the Completion Guarantor, the Distributor, Octagon and the Authority pursuant to the Inter-Party Agreement and customary WGA, SAG and DGA liens, provided that such parties agree to customary non-disturbance provisions relating to the exploitation of the rights granted hereunder. Gatorade and GM each agree to enter into the Inter-Party Agreement in customary form and substance reasonably acceptable to Gatorade and other customary inter-party agreements with WGA, SAG and DGA in customary form and substance reasonably acceptable to Gatorade. Gatorade shall have all of the rights of a secured party under the New York Uniform Commercial Code with respect to the Collateral.

7.3    Concurrently with the signing of this Agreement, Producer shall deliver copyright mortgages and financing statements in the forms attached hereto as Exhibit "E" to evidence and perfect the Security Interest (the "Security Documents").

## 8.    Confidentiality

Gatorade and GM (each a "Party") will keep the terms of this Agreement confidential and will not disclose any contents of this Agreement to any third parties (other than the parties to the Inter-Party Agreement) without the other Party's consent or when legally compelled to do so; provided, however, that the Parties will have the right to disclose the terms of this Agreement to their agents, lawyers, accountants and other representatives and to their respective lenders and the Distributor and to the lawyers, accountants and other representatives of such lenders and the Distributor.

## 9.    Representations/Warranties/Indemnification

9.1    GM represents and warrants that:

9.1.1    GM is a limited liability company, validly existing and in good standing under the laws of New Jersey;

9.1.2    GM has the right to enter into this Agreement, to grant the rights herein granted, and to fully to perform its obligations hereunder;

9.1.3    GM has acquired or will acquire all rights in the Film and the elements thereof, including, without limitation, licenses for the music contained therein and any literary or other material on which the Film is based, and any other rights required for Gatorade's exercise and enjoyment of all rights granted to Gatorade hereunder;

9.1.4    GM has acquired or will acquire all rights in the Instructional Video and the elements thereof (including, without limitation, all bonus features and other elements included on the Video DVD), including, without limitation, licenses for the music contained therein and any literary or other material on which the Instructional

Video is based, and any other rights required for Gatorade's exercise and enjoyment of all rights granted to Gatorade hereunder;

9.1.5    No claim or litigation is pending or threatened with respect to the Film, the Instructional Video, or any right in the Film or the Instructional Video;

9.1.6    No part of the Film, the Instructional Video, any other Ancillary Production, nor any other materials provided by GM hereunder, nor the exercise by Gatorade of any of the rights herein granted to Gatorade, will violate or infringe the copyright, trademark, trade name, patent, literary, intellectual, artistic or dramatic right, right of privacy, or civil property, or any other rights whatsoever of any person or entity;

9.1.7    Each person rendering services or furnishing material in connection with the Film, the Instructional Video or any other Ancillary Production, or whose name, voice, likeness, work, composition, or material appear in or are used in connection with the Film, Instructional Video, or other Ancillary Production, has granted, released and authorized the use of same, without any compensation by Gatorade (except as expressly set forth otherwise herein) (A) in the Film, Instructional Video, and/or other Ancillary Production (as applicable), (B) in advertising, publicity and promotion of (i) the Film, Instructional Video and/or other Ancillary Production (as applicable), and/or (ii) Gatorade and its products, and (C) in connection with the rights granted herein;

9.1.8    Each person rendering services or furnishing material in connection with the Film, the Instructional Video and/or other Ancillary Production, or whose name, voice, likeness, work, composition, or material appear in or are used in connection with the Film, Instructional Video and/or other Ancillary Production, has waived the right to seek injunctive relief with respect to the Film, the Instructional Video, and/or other Ancillary Production; and

9.1.9    GM ensure that the Film, the Instructional Video, any Ancillary Production, and the placements/integrations described in this Agreement (including in Sections 1.5, 1.6, 1.7 and 1.9), and any advertising and marketing for the Film shall be in good taste and shall not disparage or otherwise create a negative impression of Gatorade or its products.

9.1.10   GM has the right to enter into and perform the Octagon Agreement and all of the "Transaction Documents" (as such term is defined in the Octagon Agreement), and that GM is not in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in the Octagon Agreement or any Transaction Document;

9.2    GM agrees to defend, indemnify and hold harmless Gatorade, and its parents, subsidiaries, affiliates, agents, licensees, and assignees, and their respective officers, directors, and employees from and against any and all claims, losses, costs, damages, and expenses (including, without limitation, reasonable attorneys' fees and settlement costs) arising out of or resulting from: (i) the breach by GM of any of its material representations, warranties, or agreements hereunder; and (ii) the development,

production, performance distribution, exploitation, advertising or promotion of the Film, the Instructional Video and/or other Ancillary Production or any rights derivative or ancillary to the Film, the Instructional Video, and/or other Ancillary Production other than any thereof attributable to the negligence or willful misconduct of an indemnitee.

    9.3    Gatorade represents and warrants that:

    9.3.1    Gatorade is a corporation, validly existing and in good standing under the laws of Indiana;

    9.3.2    Gatorade has the right to enter into this Agreement, to grant the rights herein granted, and to fully to perform its obligations hereunder;

    9.3.3    Gatorade has acquired or will acquire all rights in the Sponsor Materials and the elements thereof (excluding the Gracie Elements), including, without limitation, licenses to the music contained therein and any literary or other material on which the Sponsor Materials are based;

    9.3.4    No claim or litigation is pending or threatened with respect to the Sponsor Materials or any right therein;

    9.3.5    Except in respect of Gracie Elements, no part of the Sponsor Materials, nor the exercise by GM of any of the rights herein granted to GM, will violate or infringe the copyright, trademark, trade name, patent, literary, intellectual, artistic or dramatic right, right of privacy, or civil property, or any other rights whatsoever of any person or entity; and

    9.3.6    Except in respect of Gracie Elements (and, for purposes of clarity, except with respect to any person who's name voice, likeness, work, composition, or material appears in or is used in connection the Gracie Elements), each person rendering services or furnishing material in connection with the Sponsor Materials or whose name, voice, likeness, work, composition, or material appear in or are used in connection with the Sponsor Materials have granted, released and authorized the use of same (A) in the Sponsor Materials, (B) in advertising, publicity and promotion of the Sponsor Materials and/or of Gatorade and its products, and (C) in connection with the rights granted herein;

    9.4    Gatorade agrees to defend, indemnify and hold harmless GM, and its parents, subsidiaries, affiliates, agents, licensees, and assignees, and their respective officers, directors, and employees from and against any and all claims, losses, costs, damages, and expenses (including, without limitation, reasonable attorneys' fees and settlement costs) arising out of or resulting from: (i) the breach by Gatorade of any of its representations, warranties, or agreements hereunder; and (ii) the development, production, performance distribution, exploitation, advertising or promotion of the Sponsor Materials or any rights derivative or ancillary thereto, other than any thereof attributable to the negligence or willful misconduct of an indemnitee.

10. **Insurance**

10.1   GM shall arrange production insurance to be effected and maintained in a manner subject to Gatorade's written approval including, but not limited to:

10.1.1  Errors and Omissions Indemnity for US $1,000,000 for any one (1) claim and US $3,000,000 in the aggregate, with a deductible no greater than $25,000;

10.1.2  Public liability insurance for the duration of production of the Film;

10.1.3  Insurance with abandonment extension against damage to or loss of negative stock, the negative and other property and equipment to be used in connection with the production of the Film;

10.1.4  Insurance with abandonment extension against the risks of accident to or illness or death of the Director, principal cast and such others as may reasonably be required;

10.1.5  Employer's liability insurance; and

10.1.6  Such other insurance as may be prudent under the circumstances of the production of the Film or as may reasonably be required by the Completion Guarantor or by law.

10.2   GM shall cause Gatorade to be named as an additional insured on all such insurance policies. GM shall provide Gatorade with a certificate of insurance evidencing the coverage required hereunder, including the amount of any deductible for each such type of insurance coverage. The certificates of insurance delivered to Gatorade shall provide that such insurance may not be canceled or modified without thirty (30) days' prior written notice to Gatorade.

10.3   Gatorade should arrange such insurance as may be prudent under the circumstances of the production of the Sponsor Materials and shall cause GM to be named as an additional insured in all such insurance policies.

11. **Legal and Other Fees**

Each Party will pay its own legal and/or other fees directly related to this Agreement.

12. **Termination**

12.1   In the event that GM shall breach any of its material obligations hereunder in any material respect, then (in addition to and without limitation of Gatorade's rights and remedies hereunder, at law or in equity), Gatorade shall have the right to terminate this Agreement by notice in writing to GM.  Any termination notice shall be sent by

registered mail (return receipt requested) to: The Gracie Movie LLC, 32 Nassau Street, 4th Floor, Princeton, New Jersey 08540, Attention: Mr. Andrew Shue.

12.2    In the event that Gatorade shall breach any of its material obligations hereunder in any material respect, then (in addition to and without limitation of GM's rights and remedies hereunder, at law or in equity), GM shall have the right to terminate this Agreement by notice in writing to Gatorade. Any termination notice shall be sent by registered mail (return receipt requested) to Mr. Dustin Cohn, The Gatorade Company, 555 West Monroe Street, Chicago, IL 60661-3716, with a copy to Karen Hunter, Esq., The Gatorade Company, 555 West Monroe Street, Law Dept. 11-13, Chicago, IL 60661-3716.

12.3    In the event of a termination of this Agreement pursuant to this Section 12, notwithstanding anything to the contrary contained herein, Gatorade shall have the right to continue to conduct its Theatrical Promotion, and any other consumer promotion that it has initiated prior to the effective termination date, in accordance with the applicable terms and conditions of the Theatrical Promotion or other consumer promotion (as applicable).

## 13.    Breach Payments

13.1    In the event that Gatorade is entitled to a refund of the Marketing Payment pursuant to the terms hereof, repayment of the Additional Marketing Payment (and repayment of such Additional Marketing Payment is not made by Octave on behalf of GM) pursuant to the terms hereof, or to the payment of any other amounts on account of a breach of any of GM's representations, warranties or agreements hereunder (any such refund, repayment, and other amounts, collectively, the "Breach Payments"), then GM shall immediately pay Gatorade the Breach Payments plus interest of ten percent (10%) per annum, compounded annually from the date on which Gatorade paid GM the Marketing Payment and the Additional Marketing Payment hereunder until the date on which the Breach Payments have been paid to Gatorade in full. For purposes of clarity, "Breach Payments" shall include any costs and expenses (including, without limitation, attorneys fees) incurred by Gatorade in enforcing its rights hereunder but shall only include the Additional Marketing Payment to the extent that Octagon fails to repay such Additional Marketing Payment to Gatorade.

13.2    To the extent that GM is unable to pay to Gatorade the full amount of the Breach Payments, then, without limiting Gatorade's rights hereunder, at law or in equity, GM shall pay and automatically assign to Gatorade any and all contingent or deferred compensation however named or defined that otherwise would have been payable to GM, Andrew Shue, John Shue, or Elizabeth Shue, or to any entity owned or controlled by GM, Andrew Shue, John Shue or Elisabeth Shue (each, a "Participant") in connection with the Film or any element thereof or right ancillary thereto until such time, if ever, that the full amount of the Breach Payment, plus interest thereon as set forth in Section 13.1 above, has been paid to Gatorade. Such payments shall be made to Gatorade as and when they would otherwise have been made to any Participant, but in no event later than the date upon which any contingent or deferred compensation is payable to any third party.

Gatorade shall have customary audit rights in connection therewith (which audit rights shall be at least as extensive as the audit rights granted to Octagon). The agreement between GM and each Participant shall contain the explicit agreement to the terms of this Section 13.

**14.     Miscellaneous**

This Agreement shall be governed by laws of the State of New York, without regard to the conflicts of law principles thereof. This Agreement contains the entire agreement of the Parties with respect to the subject matter hereof and may not be modified except in a writing signed by the Parties. This Agreement is not for the benefit of any third party and shall not be deemed to give any right or remedy to any such party; provided, however, that the Producer may assign a security interest in this Agreement to lenders to the Producer. Nothing herein contained shall in any way create any association, partnership, joint venture or the relation of principal and agent between the parties. No waiver by either Party of a breach or default hereunder shall be deemed a waiver by such Party of a subsequent breach of like or similar nature. This Agreement may be signed in counterparts and each such counterpart shall constitute an original document, and all such counterparts, taken together, shall constitute one and the same instrument. Counterparts delivered by facsimile or other electronic means shall have the same force and effect as an original. Upon Gatorade's request, GM will execute such other assignments, documents or agreements deemed necessary or appropriate by Gatorade to carry out the purposes of this Agreement.

Agreed and Accepted:

GRACIE MOVIE LLC

By: _____
    Andrew E. Shue

Title: _____Manager_____

THE GATORADE COMPANY

By: _____
    Charles I. Maniscalco

Title: _____

would otherwise have been made to any Participant, but in no event later than the date upon which any contingent or deferred compensation is payable to any third party. Gatorade shall have customary audit rights in connection therewith (which audit rights shall be at least as extensive as the audit rights granted to Octagon). The agreement between GM and each Participant shall contain the explicit agreement to the terms of this Section 13.

14.    **Miscellaneous**

This Agreement shall be governed by laws of the State of New York, without regard to the conflicts of law principles thereof. This Agreement contains the entire agreement of the Parties with respect to the subject matter hereof and may not be modified except in a writing signed by the Parties. This Agreement is not for the benefit of any third party and shall not be deemed to give any right or remedy to any such party; provided, however, that the Producer may assign a security interest in this Agreement to lenders to the Producer. Nothing herein contained shall in any way create any association, partnership, joint venture or the relation of principal and agent between the parties. No waiver by either Party of a breach or default hereunder shall be deemed a waiver by such Party of a subsequent breach of like or similar nature. This Agreement may be signed in counterparts and each such counterpart shall constitute an original document, and all such counterparts, taken together, shall constitute one and the same instrument. Counterparts delivered by facsimile or other electronic means shall have the same force and effect as an original. Upon Gatorade's request, GM will execute such other assignments, documents or agreements deemed necessary or appropriate by Gatorade to carry out the purposes of this Agreement.

Agreed and Accepted:

GRACIE MOVIE LLC

By:_____
    Andrew E. Shue

Title:_____

THE GATORADE COMPANY

By:_____
    Charles I. Maniscalco

Title: President_____

**Exhibit A**

**Placement Plan**

**<u>Exhibit B</u>**

Gatorade Placement/Integration Guidelines

**Exhibit C**

Final Budget and Cash Flow Statement

## Exhibit D

## Gatorade Markets

| | |
|---|---|
| 1 | Los Angeles, CA |
| 2 | New York |
| 3 | Miami/Ft Lauderdale |
| 4 | Baltimore/Washington |
| 5 | Phoenix/Tucson |
| 6 | Chicago, IL |
| 7 | San Antonio/Corpus Christi |
| 8 | Dallas/Ft Worth |
| 9 | Tampa/St Petersburg |
| 10 | Philadelphia, PA |
| 11 | Boston, MA |
| 12 | Atlanta, GA |
| 13 | Houston, TX |
| 14 | San Fran/Oakland |
| 15 | Orlando, FL |
| 16 | Memphis, TN |
| 17 | San Diego, CA |
| 18 | Denver, CO |
| 19 | Harrisburg/Scranton |
| 20 | Hartford/Springfield |
| 21 | Detroit, MI |
| 22 | Seattle/Tacoma |
| 23 | Cincinnati/Dayton |
| 24 | Jacksonville, FL |
| 25 | Raleigh/Greensboro |
| 26 | Portland, OR |
| 27 | Charlotte, NC |
| 28 | Sacramento, CA |
| 29 | Birmingham/Montgomery |
| 30 | New Orleans/Mobile |
| 31 | Buffalo/Rochester |
| 32 | Salt Lake City, UT |
| 33 | Roanoke, VA |
| 34 | Indianapolis, IN |
| 35 | Milwaukee, WI |
| 36 | Pittsburgh, PA |
| 37 | Columbus, OH |
| 38 | Toledo, OH |
| 39 | Bentonville. AR |
| 40 | Columbia, SC |
| 41 | St. Louis, MO |

42   Minneapolis/St. Paul
43   Cleveland, OH
44   Nashville, TN
45   Kansas City, KS
46   Peoria/Springfield
47   Providence, RI
48   Grand Rapids, MI
49   Albany, NY
50   Louisville, KY

**Exhibit E**

## COPYRIGHT MORTGAGE AND ASSIGNMENT FOR PURPOSES OF SECURITY

WHEREAS THE GRACIE MOVIE LLC, ("Producer") is a party to a Strategic Marketing Agreement, dated as of August 31, 2006 (the "Marketing Agreement") between Producer and THE GATORADE COMPANY ("Secured Party") with respect to the development, production and marketing of a motion picture currently entitled "Gracie" (the "Film");

WHEREAS pursuant to Section 7 of the Marketing Agreement, Producer has granted to Secured Party a security interest in all of Producer's right, title and interest in and to the Collateral (as such term is defined in the Marketing Agreement), in order to secure the performance of Producer's obligations under the Marketing Agreement (collectively, the "Obligations"); and

WHEREAS the Collateral includes, without limitation, all of Producer's right, title and interest in and to the screenplay for the Film, the Film, and all parts thereof and rights relating thereto (including, without limitation, all domestic and foreign copyrights in the Film and all of the literary and artistic material upon which the Film is based);

NOW, THEREFORE, for good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, Producer hereby grants to the Secured Party, as security for the Obligations, a continuing interest in all of Producer's right, title and interest in and to the Collateral.

This Copyright Mortgage and Assignment for Purposes of Security is granted in conjunction with the security interests granted to the Secured Party pursuant to the Marketing Agreement and is subject to the terms and conditions of the Marketing Agreement.

THIS COPYRIGHT MORTGAGE AND ASSIGNMENT FOR PURPOSES OF SECURITY SHALL IN ALL RESPECTS BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED WHOLLY WITHIN SUCH STATE.

IN WITNESS WHEREOF, Producer and Secured Party have caused this Copyright Mortgage and Assignment for Purposes of Security to be duly executed by their duly authorized representatives as of the day first above written.

THE GRACIE MOVIE LLC (the "Producer")

By: _____

Its: _____

_____

**THE GATORADE COMPANY** (the "Secured Party")

By: _____

Its: _____

**Exhibit E**

Gatorade Sales Channels

**Mass:**
Wal-Mart
Target
K-Mart

**Club:**
BJ'S

**Grocery:**
PATHMARK
BIG Y
WEIS
LOWES FOODS
PENN TRAFFIC
WAKEFERN
HARRIS TEETER
UKROP'S SUPERMARKETS
WINN DIXIE CORP
A&P
MEIJER
ALBERTSONS
SCHNUCKS
KROGER
B&B CASH GROCERY
GIANT EAGLE -
FOUR B
KINGS
SUPERVALU
DIERBERGS MARKETS
BASHA'S
SAVE MART
AHOLD
PUBLIX
INGLES
HY VEE
HE BUTT

**Additional Grocery and Other Stores:**
LOWE'S HOME IMPROVEMENT STORES
BROOKSHIRE CORP
BRUNO'S - CORP
DELHAIZE CORP
DELHAIZE FOOD LION

FKKS: 300657.v4

43

14718.201

FAMILY DOLLAR
FIESTA
FOODTOWN
HOMELAND
KROGER RALPH'S
LONGS
MINYARD
RALEY'S
SAFEWAY
SHOPKO
STATER BROS
WALGREENS
WEGMANS
RAINBOW FOOD STORES